1  Kenneth M. Trujillo-Jamison (Bar No. 280212)
   ktrujillo-jamison@willenken.com
2  Sharon Song (Bar No. 313535)
   ssong@willenken.com
3  WILLENKEN LLP
   707 Wilshire Blvd., Suite 4100
4  Los Angeles, California 90017
   Telephone:  (213) 955-9240
5  Facsimile:  (213) 955-9250
6
7  Attorneys for Defendant X Corp.

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11

12  ANTHONY TRUPIA,                    Case No.: 5:25-cv-03685-NW

13            Plaintiff,

14  v.                                 **DEFENDANT X CORP.'S MOTION TO
                                       DISMISS THE FIRST AMENDED
                                       COMPLAINT**
15  X CORP., *et al.*,
                                       The Hon. Noël Wise
16            Defendants.
                                       **Hearing:**
17                                     Date:      April 29, 2026
                                       Time:      9:00 A.M.
18                                     Ctrm:      3
19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................2

        A.      Plaintiff's Allegations .............................................................................2

        B.      The X Platform and the Relevant Terms ................................................3

III.    ARGUMENT .........................................................................................................6

        A.      The FAC Should Be Dismissed Because Plaintiff Has Not Properly Served
                X Corp...................................................................................................6

        B.      The FAC Should Be Dismissed Because Plaintiff Fails to Establish This
                Court Has Personal Jurisdiction over X Corp..........................................7

        C.      The FAC Should Be Dismissed Because Plaintiff Fails to State Any Claim ..........9

                1.      Section 230 Provides Immunity from All Claims.........................10

                2.      The First Amendment Independently Bars Plaintiffs' Claims...................13

                3.      The Relevant Terms Separately Foreclose Plaintiff's Claims ...................14

                4.      Plaintiff Fails to State a Claim .................................................16

IV.     CONCLUSION.......................................................................................................25

DEF. X CORP.'S MOTION TO TRANSFER

## NOTICE OF MOTION AND MOTION TO DISMISS

**PLEASE TAKE NOTICE** that on April 29, 2026 at 9:00 A.M., before the Honorable Noël Wise, in Courtroom 3 of the United States District Court, Northern District of California, this Motion to Dismiss filed by X Corp. will be heard.  Under Federal Rules of Civil Procedure 12(b)(2), (5), and (6), X Corp. hereby moves for an order dismissing all claims in the First Amended Complaint (ECF No. 34-1; the "FAC") with prejudice. This Motion is based on this Notice of Motion and Motion to Dismiss, the Memorandum of Points and Authorities, the Declarations of Seth Fuchs and Megan Scolari, the papers on file, and the argument received by the Court.

## STATEMENT OF RELIEF SOUGHT

X Corp. respectfully seeks an order dismissing the FAC for lack of jurisdiction and because the FAC fails to state a claim upon which relief can be granted.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The FAC, like Plaintiff's previous complaint, should be dismissed without leave to amend. The FAC remains focused on X Corp.'s alleged "suppression" of Plaintiff's posts on X, X Corp.'s private social media platform. Plaintiff still fails to identify any promise guaranteeing him the "unmoderated free speech to the extent allowed by law" that he seeks, and he ignores that his contracts with X Corp. expressly permit it to moderate his content on X.

Two threshold defects still warrant dismissal of the FAC. *First*, Plaintiff still has not properly served X Corp., nearly eight months after filing the initial complaint, and therefore

---

[1] As X Corp.'s concurrently filed Motion to Transfer explains, this action should be transferred to the United States District Court for the Northern District of Texas pursuant to the forum selection clauses in the relevant versions of the X Terms of Service and the X Purchaser Terms of Service.

Also, to X Corp.'s knowledge, Defendants Musk and Yaccarino, like X Corp., have not been served. Nevertheless, dismissal of all claims against them is warranted for the same reasons described in X Corp.'s motion. *See Fazio v. Wash. Mut. Bank, F.A.*, 713 F. App'x 671, 672 (9th Cir. 2018) ("The district court properly dismissed [plaintiff's] claims against the defendants who did not move to dismiss the complaint") (citing *Silverton v. Dep't of Treas.*, 644 F.2d 1341, 1345 (9th Cir. 1981).

1   dismissal is warranted under Federal Rule of Civil Procedure 12(b)(5). Second, this Court still

2   lacks personal jurisdiction over X Corp., a Nevada corporation with its principal place of business

3   in Texas, because no factual allegations connect it to California, thus dismissal is warranted under

4   Federal Rule of Civil Procedure 12(b)(2).

5       On the merits, X Corp. is immune from all claims under Section 230, the First Amendment,

6   and the Relevant Terms. X Corp. is "perforce immune under Section 230" from Plaintiff's claims,

7   which all challenge X Corp.'s alleged "suppression of Plaintiff's content." FAC ¶ 2; *see Fair Hous.*

8   *Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008)

9   ("[a]ny activity that can be boiled down to deciding whether to exclude material that third parties

10  seek to post online" is immune). The First Amendment likewise protects X Corp.'s exercise of

11  "exactly the kind of editorial judgment" that Plaintiff complains of. *Moody v. NetChoice, LLC*,

12  603 U.S. 707, 718, 735 (2024). And the relevant versions of the X Terms of Service and X

13  Purchaser Terms of Service (together, the "Relevant Terms") broadly disclaim liability for, among

14  other things, X Corp.'s alleged "refus[al] to distribute any Content on the Services" or to "limit

15  distribution or visibility of any Content on the service." And, in any event, the FAC still fails to

16  state any claim, because Plaintiff fails to plausibly allege the required elements of his claims.

17      Plaintiff has already amended once—after X Corp.'s motion to dismiss his initial complaint

18  was fully briefed—and still cannot plead around the various inescapable bars to his claims. X Corp.

19  respectfully requests that the Court dismiss the FAC without leave to amend.

20  **II.   STATEMENT OF FACTS**

21      **A.    Plaintiff's Allegations**

22      The FAC alleges that Plaintiff used his X account "to disseminate two civil cases of public

23  import." FAC ¶ 17. Plaintiff claims that X Corp. "suppress[ed] [] his reach" on the platform, which

24  purportedly "derail[ed]" the two cases, causing him "severe financial and reputational harm." *Id.*

25  ¶ 4. Plaintiff does not identify his posts, how they were "suppressed," or how the cases were

26  derailed, claiming only that X Corp. "suppressed Plaintiff's content through opaque algorithms,"

27  supposedly evidenced by the fact that even though he *gained* followers between 2023 and 2025,

28  "none of his posts exceeded 18 likes" whereas his 2023 posts "received 20+ likes." *Id.* ¶¶ 23, 27.

1    Plaintiff concedes that "Plaintiff's content achieved . . . visibility . . . through . . . 'reply guy'

2    tactics" (*id.* ¶ 27), but he claims that "X.com flagged and debooosted" his "free speech critique on

3    Yaccarino's account," and that X Corp. "marked Plaintiff's posts exposing 'invisible replies' (a

4    form of suppression) as spam, further limiting visibility." *Id.* ¶¶ 25. Plaintiff also alleges that Musk

5    and Yaccarino made public posts on the X platform from their personal accounts about "free

6    speech." *Id.* ¶ 19. The alleged posts contain no semblance of terms or conditions for using the X

7    platform and make no mention of X Corp.'s paid subscriptions. Nevertheless, Plaintiff claims these

8    posts together with "Plaintiff's understanding of the benefits" of an alleged subscription as

9    including "priority/boosted placement in replies," (*id.* ¶ 29) entitled him to "unmoderated free

10   speech" on X's platform. *Id.* ¶ 48.

11       **B.    The X Platform and the Relevant Terms**

12       X Corp. is a private company that operates X, an online platform where users like Plaintiff

13   can make and share posts. *See generally* FAC. To create an X account, users must agree to a set

14   of binding Terms of Service that "govern . . . users' access to and use of [X Corp.'s] services" that,

15   at all relevant times, have been times publicly available on the X website and application. Scolari

16   Decl. ¶¶ 6–7, 14. Also at all relevant times, the Terms of Service have been prominently linked

17   via blue hyperlinks on X's home page, between the links that allow users to sign up for the X

18   platform. *Id.* ¶ 7.

19       Plaintiff created his X account in 2023, his allegations confirm he used it as recently as

20   September 22, 2025, and X Corp.'s records confirm he continues using to this day. FAC ¶¶ 7, 27;

21   *see id.* ¶¶ 39–40 (alleging a third-party user "viewed Plaintiff's pinned video" on X and sent

22   Plaintiff a message through X); Scolari Decl. ¶ 22. At all relevant times, including when Plaintiff

23   created his account, the Terms of Service provided that "[b]y using the Services [the user] agree[s]

24   to be bound by these Terms." Scolari Decl. ¶¶ 12–13 & Exs. A, B.[2] And at all relevant times, the

25

26   _____

27   [2] At all relevant times, "Services" was defined broadly to include X's "various websites, SMS,
     APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other
28   covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that
     link to these Terms (collectively, the 'Services')." *Id.*

Terms of Service provided that X Corp. "may revise the terms from time to time," and that "[b]y continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms." *Id.* ¶ 7 & Exs. A, B.[3] On January 30, 2025, Plaintiff clicked an acknowledgment further manifesting his assent to the Relevant TOS. *Id.* ¶ 21.

The Relevant TOS expressly reserve X Corp.'s right to "remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to [users]."[4] *Id.*, Exs. A, B. They reiterate that "[n]o advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein." *Id.* They also expressly permit X Corp. to "stop (permanently or temporarily) providing the Services or any features within the Services to [users]" and explains that X Corp. "retain[s] the right to create limits on use . . . at [its] sole discretion at any time." *Id.*

The Relevant TOS further provides that:

> You understand and agree that the Services are provided to you on an 'AS IS' and 'AS AVAILABLE basis . . . The X Entities make no warranty or representation and disclaim all responsibility and liability for . . . the deletion of, or the failure to store or to transmit . . . any Content and other communications . . . .

*Id*. The Relevant TOS reiterate, in all capital letters, that:

> TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, RELIANCE OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES . . . .

*Id*. Finally, the Relevant TOS provide that "[t]he laws of the State of Texas . . . will govern these

---

[3] The Relevant TOS also defines the "X Entities" as "X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors."

[4] This Court may take judicial notice of X's publicly available Terms because they are available on X's website and their validity and authenticity cannot reasonably be in dispute. *See Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *4 (N.D. Cal. Oct. 3, 2022).

1  Terms and any dispute that arises between you and us . . . ." *Id.*

2  When Plaintiff "signed up for a paid X.com account in July 2024" (*id.* ¶ 28), Plaintiff was

3  required to click a "Subscribe & Pay" button, directly beneath which appeared the sentence: "By

4  subscribing, you agree to our Purchaser Terms of Service." *See* Fuchs Decl. ¶ 7. The words

5  "Purchaser Terms of Service" hyperlinked to a webpage where the Purchaser Terms could be

6  reviewed in full. *See id.* ¶ 8. The X Purchaser Terms of Service when Plaintiff signed up for a paid

7  account provided that X Corp. "may revise these X Purchaser Terms of Service from time to time"

8  and that "[b]y continuing to access or use the Paid Services after those revisions become effective,

9  you agree to be bound by the revised X Purchaser Terms of Service." Scolari Decl. ¶ 24. The

10  operative version of the X Purchaser Terms of Service (the "Relevant Purchaser Terms") provide

11  that "[t]he laws of the State of Texas . . . will govern these Terms and any dispute that arises

12  between you and us . . . ." *Id.*, Ex. D at 12–13; *see also* Ex. E (same).

13  The Relevant Purchaser Terms include the following disclaimer:

14   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, .

15   . . YOU UNDERSTAND AND AGREE THAT THE PAID SERVICES
 ARE PROVIDED TO YOU ON AN "AS IS" AND "AS AVAILABLE"

16   BASIS. . . . X MAKES NO WARRANTY OR REPRESENTATION AND
 DISCLAIMS ALL RESPONSIBILITY AND LIABILITY FOR: (I) THE

17   COMPLETENESS, ACCURACY, AVAILABILITY, TIMELINESS,
 SECURITY OR RELIABILITY OF THE PAID SERVICES[.]

18

19  *Id.* at 10; *see also* Ex. E (same). The Relevant Purchaser Terms reiterate that:

20   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW,
 THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT,

21   INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE
 DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER

22   INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA,
 USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING

23   FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS
 OR USE THE PAID SERVICES.

24

25  *Id*; *see also* Ex. E (same). Finally, like the Relevant TOS, the Relevant Purchaser Terms provides

26  that "[t]he laws of the State of Texas . . . will govern these Terms and any dispute that arises

27  between you and us . . . ." *Id.* at 13–14; ; *see also* Ex. E (same).

28

## III. <u>ARGUMENT</u>

### A. The FAC Should Be Dismissed Because Plaintiff Has Not Properly Served X Corp.

"A federal court is without personal jurisdiction over a defendant unless the defendant has been served [with the summons and complaint] in accordance with Fed. R. Civ. P. 4." *Crowley v. Bannister*, 734 F.3d 967, 974–75 (9th Cir. 2013). "Neither actual notice, nor simply naming the person in the caption of the complaint, will subject defendants to personal jurisdiction if service was not made in substantial compliance with Rule 4." *Id.* at 975. "Once service is challenged, plaintiffs bear the burden of establishing that service was valid under Rule 4." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004).

As explained in X Corp.'s previously filed Motion to Dismiss or Transfer (ECF No. 22), Plaintiff has not properly served X Corp. with summons and the initial Complaint, which warrants dismissal under Rule 12(b)(5). *Id.* at 8–9 (explaining why Plaintiff's only attempt to serve X Corp.—by *mailing* the initial complaint and summons *himself* on August 27, 2025, *more than 90 days after he filed the Complaint* on April 28, 2025—was insufficient); *see also* Fed. R. Civ. P 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.")

Now, *nine* months since the initial complaint was filed, and *four* months after X raised the service deficiencies, Plaintiff still has not properly served X Corp., nor has Plaintiff made any attempt to remedy this failure, much less explain it. Accordingly, the FAC should be dismissed. *See Verbick v. Movement Tech. Co.*, 2022 WL 20140922, at *5 (S.D. Cal. Aug. 11, 2022) (ordering Plaintiff to show cause why defendants should not be dismissed for failure to effect service, because "[a]lthough the initial complaint is no longer operative, for amended complaints to be operative, and properly served pursuant to Federal Rule of Civil Procedure 5, there must be proper service of the initial complaint to initiate the case"); *see also Jean-Baptiste v. Copart*, 2022 WL 16643046, at *2 (S.D. Fla. Nov. 2, 2022) (dismissing amended complaint, even where defendants were eventually served because "longer than the 90 days allowed under the Federal Rules of Civil Procedure" had elapsed).

**B. The FAC Should Be Dismissed Because Plaintiff Fails to Establish This Court Has Personal Jurisdiction over X Corp.**

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate," and "cannot simply rest on the bare allegations of its complaint." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

Plaintiff has not established this Court has personal jurisdiction over X Corp. *See Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 582 U.S. 255, 262 (2017). Even after X Corp. moved to dismiss the initial complaint on this basis, highlighting the dearth of factual allegations, Plaintiff failed to add any allegations supporting general or specific personal jurisdiction over X Corp. *Compare* ECF No. 22 at 18–19 and ECF No. 33 at 8–9 (addressing those arguments) *with* ECF No. 34-1 at 12. Plaintiff's failure to cure this pleading deficiency warrants dismissal without further leave to amend. *See Gunn v. Wild*, 771 F. App'x 392, 393 (9th Cir. 2019).

The FAC still fails to establish this Court has general personal jurisdiction over X Corp. X Corp. is neither incorporated in, nor maintains its principal place of business, in California. FAC ¶ 8 ("Defendant X Corp. is a corporation organized under the laws of Nevada, with its principal place of business in Bastrop, Texas"); *see Vantage Mobility Int'l Ltd. Liab. Co. v. Kersey Mobility Ltd. Liab. Co.*, 836 F. App'x 496, 498 (9th Cir. 2020) (citing *Daimler AG v. Bauman,* 571 U.S. 117, 125 (2014)). No other allegations connect X Corp. to California, let alone show that X Corp. has "continuous and systematic" connections and is "essentially at home" here. *See Daimler AG,* 571 U.S. at 119. To the contrary, Plaintiff alleges that Defendant Musk, "*residing in Texas*" is "Chairman and CTO of X Corp." and "a primary architect of X.com's policies, public statements, and operational decisions." FAC ¶ 9 (emphasis added).

Nor does the FAC establish this Court has specific personal jurisdiction over X Corp., which requires showing both that X Corp. (1) "direct[ed] [its] activities" at California or otherwise purposefully availed itself of California's protections and laws, and (2) that the claims "arise[] out of or relate to [X Corp.'s] forum-related activities." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). The FAC contains no factual allegations supporting either prong. *See Geegieh v. Unknown*

1    *Parties*, 2025 WL 1769766, at *4 (D. Ariz. June 26, 2025) (dismissing claims and rejecting

2    sufficiency of the allegation that "X Corp. operates a nationwide platform accessible in Arizona").

3         Instead, on the first prong, Plaintiff concludes that "Defendants purposefully availed

4    themselves of California (Musk and Yaccarino direct operations from/into the state;

5    representations targeted nationwide, including California users)." FAC ¶ 12. But such "bare bones

6    assertions of minimum contacts" and "legal conclusions unsupported by specific factual

7    allegations" "will not satisfy [his] pleading burden." *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th

8    Cir. 2007) ("allegations that '[defendants] directed communication into the U.S. Western District

9    of Washington and otherwise conducted business therein' . . . are insufficient"); *Mission Trading

10   Co. v. Lewis*, 2016 WL 6679556, at *4 (N.D. Cal. Nov. 14, 2016) (allegations that "Defendants

11   are conducting business in this District . . . with full knowledge that the damage caused by their

12   acts are directed towards residents of this venue" are insufficient).  Indeed, the FAC alleges the

13   supposed misrepresentations at issue were "*targeted nationwide*," not at California. FAC ¶ 12; *see

14   Bradley v. T-Mobile US, Inc.,* 2020 WL 1233924, at *15 (N.D. Cal. Mar. 13, 2020) (no specific

15   personal jurisdiction where "Plaintiffs' allegations appear to be based on nothing more than the

16   fact that California is part of the United States and the lack of any evidence that Defendants

17   exempted California from their nationwide campaign").   On the second prong, Plaintiff's

18   conclusory assertion that his "claims arise from these contacts (suppression tied to California-

19   based algorithms and harms during Plaintiff's partial California residency)" (FAC ¶ 12) fares no

20   better. In any event, Plaintiff's claims do not arise from "algorithmic *design*," but rather his use of

21   X and X Corp.'s purported *use* of algorithms to "suppress" his content. *See* FAC ¶ 2–4. The only

22   other alleged connection to California, "*Plaintiff's* partial California residency," is insufficient to

23   establish specific personal jurisdiction.  *See Walden v. Fiore*, 571 U.S. 277, 290 (2014) ("[t]he

24   proper question is not where the plaintiff experienced a particular injury or effect but whether the

25   defendant's conduct connects him to the forum in a meaningful way").[5]

26

27

28
_____

[5] *See* § III.C.4.e, *infra*.

1

### C.  The FAC Should Be Dismissed Because Plaintiff Fails to State Any Claim

2

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint

3

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

4

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citation omitted).

5

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

6

do not suffice." *Id*. While "pro se complaints are held to less stringent standards . . . regardless of

7

whether the plaintiff is proceeding pro se or is represented by counsel, conclusory allegations or

8

legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to

9

dismiss." *Taylor v. Books A Million, Inc*., 296 F.3d 376, 378 (5th Cir. 2002) (citation modified).

10

Plaintiff fails to state any claim for four independent reasons. *First*, the Communications Decency

11

Act of 1996, 47 U.S.C. § 230 ("Section 230"), immunizes X from liability premised on limiting

12

the visibility of Plaintiff's posts on the platform. *Second*, the First Amendment protects X's

13

decisions about what content to disseminate on its platform. *Third*, the valid disclaimer and

14

limitation of liability in the Relevant Terms bar all claims, which arise out of Plaintiff's use of the

15

X platform. *Fourth*, the Complaint fails to state a claim. Accordingly, Plaintiff's claims should be

16

dismissed under Federal Rule of Civil Procedure 12(b)(6).

17

As a threshold matter, Texas law governs Plaintiff's claims because the Relevant Terms

18

provide that: "The laws of the State of Texas . . . will govern these Terms and *any* dispute that

19

arises between" Plaintiff and X Corp. *See* Scolari Decl., Ex. A § 6; *id.*, Ex. D at 12–13; *see also*

20

Ex. E (same). "In determining what state law to apply, a federal court applies the choice-of-law

21

rules of the state in which it sits." *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457

22

F.3d 1106, 1111 (9th Cir. 2006). Under California law, to determine whether a choice-of-law

23

clause is enforceable, courts consider "(1) whether the chosen state has a substantial relationship

24

to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties'

25

choice of law." *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916 (2001). Here, both

26

tests are indisputably met: X Corp., a party, maintains its "principal place of business in Bastrop,

27

Texas" and "operat[es] the social media platform X.com" that is the subject of the FAC, and key

28

1    executives like Defendant Musk reside in Texas (*id*. ¶ 9.) Therefore, Texas law applies to

2    Plaintiff's claims.[6]

3              *1.    Section 230 Provides Immunity from All Claims*

4              Section 230 bars Plaintiff's claims, which seek to hold X Corp. liable for its decisions about

5    what content users may post on X. *See Roommates*, 521 F.3d at 1170–71. In enacting Section 230,

6    Congress recognized "the benefits generated by Web-based service providers" in offering "a

7    forum" for a "political discourse," "cultural development," and "intellectual activity," and sought

8    to ensure they did not shut themselves down for fear of liability premised on decisions to permit

9    or remove users' content. *Doe v. MySpace, Inc*., 528 F.3d 413, 418 (5th Cir. 2008); 47 U.S.C. §

10   230(a). Congress had the express policy goal of removing "disincentives" to content moderation

11   (47 U.S.C. § 230(b)(4)); the statute encourages platforms to self-moderate by eliminating the

12   specter of liability for doing so—even if a user does not agree. "Section 230 must be interpreted

13   to protect websites," like X, "not merely from ultimate liability, but from having to fight costly

14   and protracted legal battles." *Roommates*,  521 F.3d at 1174.

15             Under Section 230, "No provider or user of an interactive computer service shall be treated

16   as the publisher or speaker of any information provided by another information content provider."

17   47 U.S.C. § 230(c)(1). Section 230(e)(3) provides, aside from exceptions not relevant here, "[n]o

18   cause of action may be brought and no liability may be imposed under any State or local law that

19   is inconsistent with this section." Here, all three prongs of the Section 230 analysis are met: courts

20   routinely hold that X (formerly Twitter) is an "interactive computer service provider[]" and that

21   its users' accounts and posts (like those at issue here) are "information provided by another

22   information content provider," under Section 230.  *See e.g.*, *Al-Ahmed v. Twitter*, Inc., 603 F. Supp.

23   3d 857, 880-81 (N.D. Cal. 2022) ("Twitter provides the prototypical service entitling it to

24   protections of Section 230' and 'every decision the Court has seen to consider the issue has treated

25   Twitter as an interactive computer service provider, even at the motion to dismiss stage.'")

26

27   _____

28   [6] Given Plaintiff's assumption that California law applies, the below arguments still explain (where relevant) why claims fail under either Texas or California law.

1    Accordingly, X is "perforce immune under Section 230" from suits, like this one, based on

2    "activity that can be boiled down to deciding whether to exclude material that third parties seek to

3    post online." *Roommates*, 521 F.3d at 1162; *accord Computer v. Paxton*, 747 F. Supp. 3d 1011,

4    1042 (W.D. Tex. 2024) (quoting *Roommates*). Specifically, "removing or restricting postings falls

5    within a publisher's traditional functions" so "[Section 230] (c)(1), by itself, shields from liability

6    all publication decisions, whether to edit, to remove, or to post, with respect to content generated

7    entirely by third parties." *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020), *aff'd*,

8    851 F. App'x 723 (9th Cir. 2021) (dismissing free speech, Lanham Act, and other claims); *accord*

9    *Roommates*, 521 F.3d at 1162; *Computer*, 747 F. Supp. 3d at 1042. All of Plaintiff's claims arise

10   from X's supposed "algorithmic suppression of Plaintiff's content" (FAC ¶ 2)—*i.e.*, "activity that

11   can be boiled down to deciding whether to exclude material" he sought to post online. *See* FAC

12   ¶¶ 43–47 (alleging Lanham Act claim based on "suppression of Plaintiff's public-interest

13   content"); *id.* ¶¶ 48–49 (alleging "algorithmic suppression" in violation of promise to "provide

14   unmoderated free speech to the extent allowed by law"); *id.* ¶ 50 (alleging implied covenant claim

15   based on "arbitrary and opaque suppression"); *id.* ¶¶ 51–53 (alleging promissory estoppel claim

16   based on "the suppression of his reach"); *id.* 54 (alleging UCL claim based on "suppression"); *id.*

17   ¶¶ 55–56 (alleging "Declaratory Relief - Unconscionable Contract (Cal. Civ. Code §1670.5),"

18   based on "illusory promises[,]" presumably the invented promise of an unmoderated platform); *id.*

19   ¶ 57 (alleging "Violation of California Free Speech Protections" based on "suppression").

20   Section 230 provides immunity from Plaintiff's suit "[w]hether . . . styled as breach of

21   contract, tort, or fraud claims." *See Zhang v. Twitter Inc.*, 2023 WL 5493823, at *4 (N.D. Cal.

22   Aug. 23, 2023) ("[c]ourts routinely hold Section 230 immunizes platforms from contract claims,

23   where, as here, they seek to impose liability for protected publishing activity"), *aff'd on other*

24   *grounds*, 2025 WL 66050. Accordingly, this Court has applied Section 230 to dismiss materially

25   identical free speech, UCL, and breach claims based on allegations that X "suppress[ed]

26   [p]laintiff's speech" through "shadow banning" with prejudice. *Castronuova v. Meta Platforms,*

27   *Inc.*, 2025 WL 1914860, at *4 (N.D. Cal. June 10, 2025); *see also Lewis*, 461 F. Supp. 3d at 954

28   (dismissing all claims based on allegations that Youtube was "wrongfully demonetizing,

censoring, restricting and removing [plaintiff's] videos" despite "market[ing] itself as a website that promotes free speech and freedom of expression free from censorship"). Indeed, "[n]umerous courts have applied Section 230(c)(1) at the pleading stage" to dismiss the variety of claims advanced here with prejudice. *E.g.*, *King v. Facebook, Inc.*, 2019 WL 4221768, at *2–4 (N.D. Cal. Sep. 5, 2019) (collecting cases) (dismissing breach of contract, UCL, implied covenant of good faith and fair dealing, and promissory estoppel claims), *aff'd*, 845 F. App'x 691, 692 (9th Cir. 2021); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12 (2021) (dismissing breach of contract, promissory estoppel, and UCL claims based on alleged promises to not censor the platform because "Twitter's alleged actions in refusing to publish and banning Murphy's tweets . . . reflect paradigmatic editorial decisions that are protected by Section 230"); *Brittain v. Twitter, Inc.*, 2019 WL 2423375, at *2–4 (N.D. Cal. June 10, 2019) (dismissing free speech, breach of contract, promissory estoppel, and other claims); *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *3–5 (N.D. Cal. Nov. 7, 2022) (collecting cases) (dismissing contractual claims alleging plaintiff was banned for political speech).[7]

In a transparent attempt to skirt Section 230, Plaintiff conflates his real gripe—the supposed "limited reach" of his posts and his desire for "unmoderated free speech" (FAC ¶¶ 4, 17, 22, 35, 42)—with "[his] understanding of the benefits" of a subscription to "include[] . . . priority/boosted placement in *replies*, *mentions*, and *searches*" (FAC ¶¶ 21, 29). But these allegations are a red herring: like the Initial Complaint, Plaintiff is careful to not assert any breach of the Relevant Terms, but rather some invented "enforceable obligations to provide unmoderated free speech to the extent allowed by law." *Id.* ¶ 48. Elsewhere, Plaintiff confirms that he received the subscription benefits he thought he was getting. *Id.* ¶ 27 (lamenting the amount of likes on his *posts* but noting an increase in followers and that "[his] content achieved [] visibility through . . .

---

[7] Defendants Musk and Yaccarino "are immune under § 230 to the same extent" as X because Plaintiff "sues them based on" X Corp.'s conduct. *Loomer v. Zuckerberg*, No. 22-cv-02646, 2023 WL 6464133, at *12 (N.D. Cal. Sep. 30, 2023), *aff'd*, No. 23-3158, 2025 WL 927186 (9th Cir. Mar. 27, 2025) (Section 230 immunized executives who allegedly "falsely induced the public to believe that political candidates would be treated fairly"); *Igbonwa v. Facebook, Inc.*, No. 18-cv-02027, 2018 WL 4907632, at *5 (N.D. Cal. Oct. 9, 2018), *aff'd*, 786 F. App'x 104 (9th Cir. 2019).

1   'reply guy' tactics"). At bottom, Plaintiff does not challenge a specific "promise[] *unrelated to a*

2   *defendant's role as a publisher*[,]" but rather his own interpretation of X Corp.'s moderation

3   policy, so X Corp. remains "protected from liability under § 230." *Doe v. Grindr Inc.*, 128 F.4th

4   1148, 1154 (9th Cir. 2025) (distinguishing cases where "[w]e have held that § 230 does not bar

5   causes of action seeking to enforce contracts or promises unrelated to a defendant's role as a

6   publisher"); *see also Murphy,* 60 Cal. App. 5th at 29–30 (rejecting argument that "section 230

7   immunity does not apply here because the content at issue is Twitter's own promises")).

8       Plaintiff has not, and cannot plead around the immunity provided by Section 230, so the

9   FAC should be dismissed with prejudice.

10              2.    *The First Amendment Independently Bars Plaintiffs' Claims*

11      "A private party's collection of third-party content into a single speech product . . . is itself

12  expressive, and intrusion into that activity must be specially justified under the First Amendment."

13  *Moody v. NetChoice, LLC*, 603 U.S. 707, 729 (2024). Accordingly, this Court recognizes that

14  "[l]ike a newspaper or a news network, Twitter [now X] makes decisions about what content to

15  include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by

16  the First Amendment." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-88 (N.D. Cal. 2022),

17  *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (collecting cases and dismissing

18  claims based on X Corp.'s First Amendment grounds); *Snyder v. Phelps*, 562 U.S. 443, 451 (2011)

19  ("[T]he First Amendment . . . can serve as a defense in state tort suits"). Plaintiff seeks to impose

20  liability on X Corp. based on X Corp.'s alleged decisions to "censor," "manipulate," "suppress,"

21  or otherwise limit the reach of Plaintiff's posts on its platform, claiming he is entitled to

22  "unmoderated free speech." FAC ¶¶ 2, 48. But the First Amendment protects "exactly th[is] kind

23  of editorial judgment[][,]" of "remov[ing], alter[ing], organiz[ing], prioritiz[ing], or disclaim[ing]

24  posts." *Moody*, 603 U.S. at 718, 735; *Padilla*, 579 F. Supp. 3d at 1188 ("[X Corp.] has important

25  First Amendment rights that would be jeopardized by a Court order telling [X Corp.] what content-

26  moderation policies to adopt and how to enforce those policies"). The First Amendment mandates

27  dismissal of all claims. *See O'Handley*, 579 F. Supp. at 1186 (First Amendment barred claims

28

1  based on "Twitter appending labels to [plaintiff's] tweets . . . its limitation on the reach of

2  [plaintiff's] tweets, and its ultimate removal of [plaintiff's] account from the platform").[8]

3          *3.     The Relevant Terms Separately Foreclose Plaintiff's Claims*

4        The Relevant Terms, which Plaintiff agreed to when he created and used his X account and

5  his X Premium subscription (*see* Scolari Decl. ¶¶ 21–23), bars all claims. The Relevant TOS

6  provides that X may "remove or refuse to distribute any Content on the Services [or] limit

7  distribution or visibility of any Content on the service, suspend or terminate users, and reclaim

8  usernames *without liability* to [users]." Scolari Decl., Ex. A, at § 4. It includes a disclaimer of

9  responsibility provision: "You understand and agree that the Services are provided to you on an

10  'AS IS' and 'AS AVAILABLE' basis . . . . The X Entities make no warranty or representation and

11  disclaim[s] all responsibility and liability for . . . the deletion of, or the failure to store or to transmit,

12  any Content and other communications maintained by the Services" *Id.* at 10. It reiterates that

13  "[n]o advice or information, whether oral or written, obtained from the X Entities or through the

14  Services, will create any warranty or representation not expressly made herein." *Id.*[9]

15        Furthermore, the Relevant Terms each emphasize, in bold, capital letters, that:

16
17
18
19
20
    **THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT,
    INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES,
    RELIANCE OR ANY LOSS OF PROFITS OR REVENUES, WHETHER
    INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA,
    USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING
    FROM (i) [Plaintiff's] ACCESS TO OR USE OF OR INABILITY TO
    ACCESS OR USE THE [SERVICES or PAID SERVICES]; (ii) ANY**

---

21  [8] For these same reasons, Plaintiff's requested injunctive relief would be unconstitutional. *See*

22  *Moody*, 603 U.S. at 733 ("in case after case, the [Supreme] Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive

23  realm"); *see also Madsen v. Women's Health Ctr Inc.,* 512 U.S. 753, 765 (1994) (refusing to grant injunction that would offend another party's First Amendment rights). Separately, Plaintiff has not

24  alleged "continuing" conduct with "present adverse effects" and thus lacks standing to seek future injunctive relief. *Abdulaziz v. Twitter, Inc*., No. 21-16195, 2024 WL 4688893, at *2 n.4 (9th Cir.

25  Nov. 6, 2024).

26  [9] The Relevant Purchaser Terms include a similar provision that applies to Paid Services, while

27  explaining that "THE DEFINITION OF PAID SERVICES IS LIMITED TO THE FEATURES OFFERED BY X AND *DOES NOT INCLUDE ANY CONTENT YOU ACCESS AND/OR*

28  *INTERACT WITH IN USING THOSE FEATURES*" and that the X ToS "always applies to your use of the X Service." Scolari Decl., Ex. D at 2, 7, 10 (emphasis added); *see also id.*, Ex. E.

**CONDUCT OR CONTENT OF ANY THIRD PARTY POSTED THROUGH THE [SERVICES or PAID SERVICES]" under "ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE**

*Id.*; *id.*, Ex. D, at 10; *see also id.*, Ex. E (same). The Relevant Terms each make clear that "[Paid Services or Services] may change from time to time, at our discretion[,]" that X "may stop (permanently or temporarily) providing the [Paid Services or Services] or any features within the [Paid Services or Services] to you or to users generally with or without notice" and that X "is not liable to you or to any third party for any modification, suspension or discontinuance of the [Paid Services or Services]." *Id.*, Ex. A § 4; *id.*, Ex. D at 6; *see also id.*, Ex. E (same).

All of Plaintiff's claims are premised on alleged "suppression" of Plaintiff's content on X through, among other things, "limiting [the] visibility" of that content. FAC ¶¶ 2, 4, 23–24. Because the Relevant Terms disclaim liability for that alleged conduct, the FAC should be dismissed. *See, e.g.*, *Murphy*, 60 Cal. App. 5th at 36 (enforcing the limitation of liability clause in the Twitter Terms and affirming dismissal); *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125 (2015) (recognizing that similar clauses "have long been recognized as valid in California" and affirming dismissal); *Bombardier Aero. Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 233 (Tex. 2019) ("Limitation-of-liability clauses . . . are generally valid and enforceable" under Texas law). Plaintiff's claimed entitlement to "enhanced, algorithmically unsuppressed reach" of his posts (FAC ¶¶ 21, 22, 29) are barred by the Relevant TOS which explains that X may "remove or refuse to distribute any Content on the Services [or] limit distribution or visibility of any Content on the service" "without liability to" the user, that "the X Entities make no warranty or representation and disclaim all responsibility and liability for the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services[,]" and that "[n]o advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein." Scolari Decl., Ex. A §§ 4–5. Such claims are further barred by the Relevant Terms' provisions that (1) X Corp. "may stop (permanently or temporarily) providing the [Paid Services, or Services] or any features within the [Services or Paid Services] to you or to users generally with or without notice," and that (2) X

1    Corp. "is not liable to you or to any third party for any modification, suspension or discontinuance

2    of the [Services or Paid Services]." *Id.*, Ex. A at § 4; *id.*, Ex. D at 6; *see also id.*, Ex. E (same).[10]

3                    4.    *Plaintiff Fails to State a Claim*

4            Setting aside that Section 230, the First Amendment, and the Relevant Terms bar all claims,

5    Plaintiff still fails to plausibly allege any claim.

6            Because the FAC alleges "opaque and punitive practices" and "bad faith suppression" and

7    "systematic misrepresentation'" (*see generally* FAC), the heightened pleading standard of Rule

8    9(b) applies. *Kearns v. Ford Motor Co*., 567 F.3d 1120, (9th Cir. 2009). But all claims fail even

9    under the ordinary standard, as the Complaint is devoid of factual allegations, relies on conclusory

10   statements, and utilizes group pleading throughout. At bottom, all claims suffer from the same

11   fatal flaws: Plaintiff was never promised anything about the reach of his posts and has not plausibly

12   alleged the "opaque" algorithmic suppression he complains of.

13                    a.    Plaintiff's 15 U.S.C. § 1125(a) ("Lanham Act") Claim Fails

14           Plaintiff lacks statutory standing to bring a Lanham Act claim because he brings it as a

15   "user" of X Corp. (FAC ¶ 46) "and not as a competitor with a commercial interest in reputation or

16   sales." *See Lewis v. Google Ltd. Liab. Co*., 851 F. App'x 723, 724-25 (9th Cir. 2021); *Bacon v.*

17   *Sw. Airlines Co*., 997 F. Supp. 775, 781 (N.D. Tex. 1998) (no private right of action for consumers

18   under § 1125(a)). In *Lewis*, a user lacked standing to a far more specifically alleged Lanham Act

19   claim asserting that YouTube "market[ed] itself as a website that promotes free speech . . . free

20   from censorship," while censoring and demonetizing his posts, causing "lower and diverted

21   viewership, decreased and lost ad revenue, a reduction in advertisers, and damage to [plaintiff's]

22   brand, reputation and goodwill." *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 958 (N.D. Cal. 2020).

23   The Ninth Circuit affirmed, reasoning that "even if [plaintiff] could allege . . . some loss to his

24

25

26   _____

27   [10] To the extent Plaintiff complains of a standalone "price hike," (FAC ¶ 54) that too is barred by
     the Relevant Purchaser Terms, which explain that "recurring subscription fees[] are subject to
28   change from time to time[,]" and that "you have the right to reject the change by cancelling your
     subscription to the applicable Paid Service prior to the price change going into effect."

1    commercial interest or reputational harm," it occurred "by interacting with YouTube as a

2    consumer, not as a competitor." *Lewis*, 851 F. App'x 723, 724 (9th Cir. 2021).

3         Plaintiff's lack of statutory standing aside, he fails to identify any commercial promotional

4    statement, let alone a false one. The alleged posts from Musk and Yaccarino "representing X.com

5    as a free speech platform" (FAC ¶ 43) do not mention any paid subscription, and are quintessential

6    opinions or 'puffery.' *Lewis*, 461 F. Supp. 3d at 958 (N.D. Cal. 2020); *Prager Univ. v. Google

7    LLC*, 951 F.3d 991, 1000 (9th Cir. 2020) ("braggadocio about [a] commitment to free speech

8    constitutes opinions that are not subject to the Lanham Act"). The alleged posts are even more

9    vague than the generalizations inactionable in *Lewis* and *Prager*. *Compare* (FAC ¶ 19

10   ("fortunately, X believes in free speech")) *with Prager Univ.*, 951 F.3d at 1000 ("YouTube

11   believes that people should be able to speak freely, share opinions, [and] foster open dialogue").

12   As for the alleged "subscription feature promising 'priority/boosted placement in replies,

13   mentions, and searches" (FAC ¶¶ 29, 43), "[n]ot all commercial speech is promotional," including

14   "statements . . . made to explain a user tool, not for a promotional purpose to 'penetrate the relevant

15   market' of the viewing public." *Prager Univ.*, 951 F.3d at 1000. And at any rate, "Plaintiff's

16   understanding of the benefits . . . "priority/boosted placement in replies, mentions, and searches,"

17   (FAC ¶ 29) is a far cry from a "quantifiable promise[] to provide users with algorithmically

18   unsuppressed content visibility." *Id.* ¶ 43. To the contrary, the Relevant Terms that "govern

19   [Plaintiff's] and other users' access to and use of our services . . . and any information, text, links,

20   graphics, photos, audio, videos, or other materials or arrangements of materials uploaded,

21   downloaded or appearing on the Services (collectively referred to as "Content")" make clear that

22   X may "remove or refuse to distribute any Content on the Services, limit distribution or visibility

23   of any Content on the service . . . without liability to" Plaintiff.[11]

24

25

26

27

28

---

[11] The Relevant Purchaser Terms  make clear that "The X User Agreement [of which the Terms of Service are a part] always applies to your use of the X Service, including the Paid Services and features." Scolari Decl., Ex. D, at 2, 7; *see also id.*, Ex. E (same).

1

b.    Plaintiff Fails to State a Breach of Contract Claim

2    Under Texas (and California law), Plaintiff must plausibly allege "(1) the existence of the

3    contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

4    the resulting damages." *See Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 124, (2015); *Tiras v.*

5    *Bailey Props., L.L.C.*, 659 F. App'x 753, 756 (5th Cir. 2016) (same). Tellingly, Plaintiff does not

6    allege a breach of the Relevant Terms. Nor could he: those contracts expressly permit the conduct

7    Plaintiff claims constitute a breach. *Id.*, Exs. A, B (reserving, among other things, X's right to

8    "remove or refuse to distribute any Content on the Services, limit distribution or visibility of any

9    Content on the service . . . without liability to [Plaintiff]."); *e.g.*, *Yuksel*, 2022 WL 16748612, at

10   *3–5 (collecting cases and dismissing similar breach of contract claims given X Corp.'s express

11   contractual rights); *Boose v. Musk*, 2025 WL 3697037, at *4 (N.D. Cal. Dec. 19, 2025) (plaintiff

12   "fails to allege breach of contract because the relevant Terms on which his claim is based contradict

13   his contention that X breached that contract"); *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541,

14   548–49 (W.D. Tex. 2017) ("California contract law is substantially the same as Texas contract

15   law"). Indeed, Plaintiff admits that his "understanding of the benefits" of his subscription did not

16   include "unmoderated free speech," he seeks. FAC ¶ 29.

17   Instead, Plaintiff invents a contrary "contract" with "enforceable obligations to provide

18   unmoderated free speech to the extent allowed by law," stitching together alleged posts about free

19   speech and his understanding of a "priority/boosted placement in replies, mentions, and searches,"

20   feature of his alleged subscription. FAC ¶ 48–49. But "it is well settled that an action based on an

21   implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express

22   contract covering the same subject matter," as is indisputably the case here with the Relevant

23   Terms. *Grebow v. Mercury Ins. Co.*, 241 Cal. App. 4th 564, 580 (2015); *Notley v. Sterling Bank*,

24   2008 WL 4952835, at *3 (Tex. App. Nov. 21, 2008) (same). Indeed, the Relevant TOS itself

25   explains that "[n]o advice or information, whether oral or written, obtained from the X Entities or

26   through the Services, will create any warranty or representation not expressly made herein."

27   Scolari Decl., Exs. A, B.

28

At any rate, the obligation sought lacks any factual or legal basis; *none* of the alleged posts mention X's paid subscriptions or contain anything resembling contract terms, so the "mutual assent or consent on definite or complete terms" required to form a contract is absent. *Netbula, LLC v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007); *Hammerhead Managing Partners, LLC v. Nostra Terra Oil & Gas Co. PLC*, 2019 WL 1403363, at *2 (N.D. Tex. Mar. 27, 2019) (similar). And because no contract "to provide unmoderated free speech to the extent allowed by law[,]" exists, Plaintiff has not alleged a breach or resulting damages. The FAC fails to plausibly allege any suppression or breach of even "Plaintiff's understanding" of his alleged subscription benefits. (FAC ¶¶ 21, 29 ("Plaintiff's understanding of the benefits included . . . priority/boosted placement in replies, mentions, and searches"). If anything, it confirms he received those benefits, (*id.* ¶ 27) (alleging Plaintiff *gained* followers and "Plaintiff's Content achieved [] visibility" with his "'reply-guy' tactics"), and that other users have seen the supposedly suppressed posts. *Id.* ¶ 39 (alleging a user messaged him "referencing one of the cases Plaintiff has alleged has been suppressed"). Finally, Plaintiff's alleged damages are wholly speculative. *See Zhang v. Twitter Inc.*, 2023 WL 5493823, at *6 (N.D. Cal. Aug. 23, 2023), *aff'd*, 2025 WL 66050 (9th Cir. Jan. 10, 2025).

### c.   The Implied Covenant of Good Faith and Fair Dealing Claim Fails

Under Texas (or California) law, Plaintiff cannot assert an implied covenant claim based on alleged "promises" (FAC 50) because they did not form a contract. *See* § II.C.5.b, *supra*; *Thomas v. JPMorgan Chase Bank, N.A.*, 2015 WL 12683961, at *4 (C.D. Cal. Sep. 15, 2015) ("no obligation to deal fairly or in good faith absent an existing contract"); *Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, 2021 WL 4269565, at *6 (5th Cir. Sep. 20, 2021) (similar); *Mercola.com, LLC v. Google LLC*, 2023 LW 5680112, at *6 (N.D. Cal. Sep. 4, 2023), *aff'd*, 2024 WL 2745208 (9th Cir. May 29, 2024) (dismissing claim because "YouTube's actions were permitted by [its] Terms.")

Plaintiff's claim based on the "subscription agreement," *i.e.*, the Relevant Terms, also fails under either states' laws. Texas does not recognize a general implied covenant of good faith and fair dealing in these circumstances. *Ramirez v. Bank of Am., N.A.*, 607 F. Supp. 3d 969, 977 (N.D. Cal. 2022) (dismissing claims with prejudice because "Texas law does not recognize an implied

duty of good faith and fair dealing in every contract"); *English v. Fischer*, 660 S.W.2d 521 (Tex.

1983); *see also In re Sw. Airlines Co. Flight Disruption Litig.*, 2024 WL 3281288, at *6 (S.D. Cal.

June 11, 2024) (dismissing claim pursuant to Southwest's terms' choice of Texas law). And if it

did, the one Plaintiff seeks is inactionable under Texas and California law, because it contradicts

and expands X's obligations under the Relevant Terms. *Storek & Storek, Inc. v. Citicorp Real Est.,*

*Inc.*, 100 Cal. App. 4th 44, 55 (2002) ("the implied covenant of good faith and fair dealing cannot

contradict the express terms of a contract"); *Exxon Corp. v. Atl. Richfield Co.*, 678 S.W.2d 944

(Tex. 1984) (same).

### d.    Plaintiff Fails to State a Promissory Estoppel Claim

Under both Texas and California law, Plaintiff's promissory estoppel claim should be

dismissed because the Relevant Terms have always "govern[ed] [Plaintiff's] and other users'

access to and use of [X's] services, including [X's] various websites." Scolari Decl., Exs. A, B;

*see SHLA Grp. Inc. v. Kissler & Co.*, 2025 U.S. Dist. LEXIS 37820, at *4 (C.D. Cal. Mar. 3, 2025)

("promissory estoppel is not applicable when a contract exists"); *TuYo Holdings, LLC v.*

*Transamerica Life Ins. Co.*, 2022 WL 17490982, at *4 (W.D. Tex. Dec. 6, 2022) (same).

Regardless, Plaintiff fails to allege (through vague posts or otherwise): (1) a promise clear

and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) that is

both reasonable and foreseeable; and (4) that caused injury. *See Laks v. Coast Fed. Sav. & Loan*

*Assn.*, 60 Cal. App. 3d 885, 890 (1976) ("a promise must be definite enough that a court can

determine the scope of the duty and the limits of performance"); *Gillum v. Republic Health Corp.*,

778 S.W.2d 558, 570 (Tex. App. 1989) (similar). The alleged statement Plaintiff invokes (FAC

¶ 51) was allegedly made *before* Musk acquired X, and allegedly reads in full "Given that Twitter

serves as the de facto public town square, failing to adhere to free speech principles fundamentally

undermines democracy. What should be done?" *Id.* ¶ 19. This and the other alleged statements are

not promises, let alone unambiguous ones, and make no mention of any subscription. *See Glen*

*Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 381 (9th Cir. 2003) (affirming dismissal where

"representations were not definite enough to be enforceable"); *Simulis, L.L.C. v. GE Capital Corp.*,

2008 WL 1747483, at *2 (Tex. App. Apr. 17, 2008) (reliance on statements that never "discussed

1    or negotiated" terms "is unreasonable as a matter of law and cannot be the basis for a promissory

2    estoppel claim"). As for alleged "priority" language, Plaintiff admits that his "understanding" was

3    "priority/boosted placement in replies, mentions, and searches" (FAC ¶¶ 21, 29), which cannot

4    reasonably be reinterpreted as "guarantee[ing] enhanced, algorithmically unsuppressed reach" of

5    his posts (FAC ¶ 22). Even under Plaintiff's interpretation, reliance would be unreasonable, as the

6    Relevant Terms have always provided that X Corp. could "remove or refuse to distribute any

7    Content." Scolari Decl., Ex. A at § 4; *id.*, Ex. B at § 4; *see Murphy*, 60 Cal. App. 5th at 38 ("Murphy

8    could not reasonably rely on promises that Twitter would not restrict access to her account,

9    "'censor'" her content, or take "account-level" action").

10                    e.    <u>The Cal. Bus. & Prof. Code § 17200 ("UCL") Claim Fails</u>

11          Because Texas law governs, Plaintiff's California UCL claim is barred. *See e.g., Cory v.*

12   *Stewart*, 103 F.4th 1067 (5th Cir. 2024) ("Under Texas rules," a choice of law provision will

13   "contractually preclude[]" claims under a non-chosen state's law, "[e]nd of story"); *Salustri v.*

14   *Dell, Inc.,* 2010 WL 11596554, at *6 (C.D. Cal. Apr. 27, 2010) ("[b]ecause Texas provides

15   protection and remedies for consumers who are subject to false advertising and unfair competition,

16   it is not contrary to California public policy to enforce the choice-of-law provision and require

17   Plaintiff to assert claims under Texas law").

18          Even under California law, Plaintiff lacks standing under the UCL for two reasons. *First,*

19   the UCL regulates "harm suffered by residents of California, which plaintiff is not, or harm to non-

20   residents that occurred in California . . . [and] plaintiff has not alleged facts suggesting that he

21   suffered harm in California." *Silverman v. Wells Fargo & Co.*, 2018 WL 6046209 at *3–4 (N.D.

22   Cal. Nov. 19, 2018) (collecting cases) (dismissing claims despite allegations that defendants

23   maintained their headquarters, principal places of business, and conducted substantial sales and

24   marketing in California). Plaintiff is, and was, an Oklahoma resident when the conduct he

25   complains of occurred. FAC ¶ 54 (premising UCL claim on "misrepresentations, suppression,

26   price hikes, feature removals, and use of Grok as a loss leader"); *id.* 3 ("Plaintiff—*a resident of*

27   *Oklahoma City, OK*—was induced by these claims to join, pay for the Premium+ subscription");

28   *id.* 17 ("Plaintiff . . . *now living in Oklahoma City*, relied on this role to disseminate two civil cases

of public import"); *id* 30-31 ("[i]n November 2025," long after Plaintiff alleged Oklahoma residency in his initial complaint, "X.com auto-billed Plaintiff . . . while removing or diluting key features" and adding Grok). The FAC also alleges that X "with its principal place of business in Bastrop, Texas" operates the platform and that "Elon Musk . . . residing in Texas" is the "primary architect of X.com's policies, public statements, and operational decisions." FAC ¶¶ 7, 8. *Second*, the FAC chiefly alleges vague "severe financial and reputational harm, including the derailment of two significant civil cases impacting the public, due to Defendants' suppression of his reach," (FAC ¶ 4), which falls short of "actual loss of income or financial support" required. *E.g.*, *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 40 (2021).[12]

To the extent Plaintiff claims the subscription charges constitute harm, he fails to sufficiently pled any unlawful, fraudulent, or unfair business act or practice that caused that harm. "The problem with Plaintiffs' arguments . . . is that they are premised on the assumption that [Plaintiff] was entitled to receive" unmoderated reach on the platform without "alleg[ing] any facts showing that this was ever promised to him." *Shuman v. SquareTrade Inc.*, 2021 WL 5113182, at *9 (N.D. Cal. Nov. 3, 2021). Claimed reliance on vague statements that did not even mention any subscription falls flat, especially where Plaintiff's own "understanding of the benefits[,]" (FAC ¶ 29) did not include "unmoderated free speech" and where the Relevant Terms disclaimed any such promise or reliance on extrinsic statements. Reliance aside, Plaintiff has not sufficiently pled that the public would be deceived about the subscription he alleges. *Murphy*, 60 Cal. App. 5th at 40–41 ("Twitter's general declarations of commitment to free speech principles" do not support claim "because it is unlikely that members of the public would be deceived by such statements" or construe them "as a promise that Twitter would not take any action to self-regulate content on its platform.") For the avoidance of doubt, Plaintiff has not plausibly alleged that any suppression

---

[12] Contradictory allegations about Yaccarino's residence and "algorithmic design[,]" are irrelevant to Plaintiff's claim, and at any rate, too conclusory to establish that harm occurred in California. *See Gustafson v. BAC Home Loans Servicing, LP*, 2012 WL 4761766, at *5–6 (C.D. Cal. Apr. 12, 2012) (allegations that "defendants' scheme was devised, implemented, and directed from defendants' offices in California" too vague and conclusory to support UCL claim).

1  occurred. FAC ¶ 27 (lamenting lack of likes but noting follower increase and that "Plaintiff's

2  content achieved . . . visibility" through "reply guy" tactics); *id.* ¶¶ 39–42 (alleging user saw his

3  supposedly suppressed post).[13]

4      As for the subsequent renewal, Plaintiff's conclusory invocation of "price hikes, feature

5  removals, and use of Grok as a loss leader" (FAC ¶ 54) are similarly defective. Plaintiff concedes

6  elsewhere that "subscription terms . . . *allow[ed]* unilateral price increases and feature removals"

7  (AC 5); *see also* Relevant Purchaser Terms ("Changes to Paid Services"' "Changes to Pricing";

8  *Hall v. HP, Inc.*, No. 8:24-cv-02507-DOC-KES, 2025 WL 1759378, at *8 (C.D. Cal. June 23,

9  2025) (no UCL claim where "Defendant's conduct was consistent with the Terms of Service" and

10  the "members of the public are not likely to be deceived"). Plaintiff's failure to cancel his

11  automatic renewal is insufficient to state a UCL claim.[14]

12              f.    Plaintiff Fails to State an "Unconscionable Contract" Claim

13      At the outset, this claim fails because "unconscionability under Cal. Civ.Code § 1670.5 is

14  not an affirmative claim." *Das v. WMC Mortgage Corp.*, 831 F. Supp. 2d 1147, 1164 (N.D. Cal.

15  2011) (collecting cases). Even if it were a valid claim, Plaintiff cannot assert it because Texas law

16  governs. *See Cory*, 103 F.4th at 1073. In any event, under either Texas or California law, "*both*

17  procedural and substantive unconscionability" must exist, and Plaintiff fails to plead either. *Lessin*

18  *v. Ford Motor Co.*, No. 3:19-cv-01082-AJB-AHG, 2020 WL 6544705, at *4 n.1 (S.D. Cal. Nov.

19  5, 2020) ("unconscionability law is generally the same in California . . . and Texas . . . .").

20      To plausibly allege unconscionability, a plaintiff must plead facts sufficient to show "unfair

21  surprise or oppression." *L.O.D.C. Grp., Ltd v. Accelerate360, LLC*, 621 F. Supp. 3d 716, 724-25

22  (E.D. Tex. 2022). The "only cases under Texas law in which an agreement was found procedurally

23  unconscionable involve situations in which one of the parties appears to have been incapable of

---

[13] To the extent alleged BBB complaints have any relevance, they confirm that Plaintiff and consumers understand that "violation reasons" (FAC ¶ 37) can result in consequences.

[14] Plaintiff does not allege that removal of the "edit reply" feature harmed him, and any claim of such harm is belied by allegation Plaintiff he "explicitly" paid for "boosted placement in replies, mentions, and searches."

1    understanding the agreement." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077 (5th Cir.

2    2022), *opinion supplemented on denial of reh'g*, 303 F.3d 570 (5th Cir. 2002). As for substantive

3    unconscionability, the test is whether "given the parties' general commercial background and the

4    commercial needs of the particular trade or case, the clause involved is so one-sided that it is

5    unconscionable under the circumstances existing when the parties made the contract." *Hafer v.*

6    *Vanderbilt Mortg. & Fin., Inc*., 793 F. Supp. 2d 987, 1004 (S.D. Tex. 2011). This test aims to

7    "prevent oppression and 'unfair surprise' rather than to alter the allocation of risks stemming from

8    the parties' differing bargaining positions." *L.O.D.C.*, 621 F. Supp. 3d at 724.

9          The FAC is bereft of "any facts demonstrating surprise" or "oppression," so it fails to allege

10   any procedural unconscionability. *See Moates*, No. 4:20-cv-896-ALM-KPJ, 2021 WL 33013371,

11   at *7. Plaintiff's conclusory assertion that "[t]he subscription terms and TOS are unconscionable,

12   both procedurally (adhesion contract, no bargaining, surprise changes) and substantively (one-

13   sided modifications, limited remedies, illusory promises)" (FAC ¶ 55), is belied by both Texas and

14   California law—each recognize that such contracts are "'indispensable facts of modern life that

15   are generally enforced'" and "the fact that [Plaintiff] had no opportunity to negotiate the terms of

16   service, standing alone, is insufficient to plead a viable unconscionability claim." *E.g.*, *Murphy*,

17   60 Cal. App. 5th at 37–38 (finding no unconscionability in X's (then Twitter's) terms and affirming

18   dismissal of claims alleging Twitter falsely "held itself out to be a free speech platform and

19   promised not to actively monitor or censor user content"); *Moates v. Facebook Inc*., No. 4:20-cv-

20   896-ALM-KPJ, 2021 WL 3013371, at *7 (E.D. Tex. May 14, 2021) (Facebook's terms not

21   unconscionable because "[i]n Texas, an adhesion contract is not automatically unconscionable[,]"

22   [t]he principles of unconscionability do not negate a bargain because one party to the agreement

23   may have been in a less advantageous bargaining position[,]" and because "parties to a contract

24   have an obligation to protect themselves by reading what they sign and, absent a showing of fraud,

25   cannot excuse themselves from the consequence of failing to meet that obligation"). Nor do the

26   Relevant Terms' alleged "limited remedies" make it substantively unconscionable. *See Van*

27   *Peterson Fine Jewelers v. ADT Sec. Servs., Inc.*, No. 3:09-CV-1883-P, 2010 WL 11617965, at *3

28   (N.D. Tex. Feb. 16, 2010) (limitation-of-liability provision in a form contract is not

1    unconscionable even if "Plaintiff had little bargaining power" because there are "valid commercial

2    reasons for including" and "strong policy reasons for enforcing such a provision"); *Murphy*, 60

3    Cal. App. 5th at 36 (rejecting allegations that X Corp. (then Twitter's) terms of service or

4    limitations of liability therein were "so one-sided as to be substantively unconscionable,"

5    recognizing "a legitimate commercial need to limit . . . liability").[15]

6                         g.    Plaintiff's California Constitution "Free Speech" Claim Fails

7            Even if an Oklahoman Plaintiff could assert this claim, the FAC fails to allege the requisite

8    state action, and this court has rejected allegations "that Twitter is an entity that may fairly be said

9    to be a state actor." *Rutenburg v. Twitter, Inc.*, No. 4:21-cv-00548, 2021 WL 1338958, at *3 (N.D.

10   Cal. Apr. 9, 2021); *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013,

11   1023 (2001) ("California's free speech clause contains a state action limitation"). Plaintiff argues

12   that X "has evolved into a virtual public square" (FAC ¶ 57), but "[n]o court has extended the

13   *Pruneyard* line of cases, which concern physical property, to the Internet." *Divino Grp. LLC v.*

14   *Google LLC*, No. 19-cv-04749, 2022 WL 4625076, at *7–8 (N.D. Cal. Sep. 30, 2022) (collecting

15   cases) (rejecting the argument that "YouTube is the cyber-equivalent of a town square"). Nor can

16   any alleged post transform X Corp. into a public square or state actor. *E.g.*, *Prager Univ. v. Google*

17   *LLC*, 951 F.3d 991, 997 (9th Cir. 2020) (plaintiff "cannot avoid the state action question" using

18   allegations that "YouTube declared itself a public forum," because that "is not a matter of election

19   by a private entity.") Plaintiff's proposed extension of *Pruneyard* "would be a dramatic expansion

20   of California law" with "potentially sweeping consequences" and a "host of potential slippery

21   slope problems that are likely to surface." *Newman v. Google LLC*, No. 20-cv-04011-VC, 2022

22   WL 2556862, at *3 (N.D. Cal. July 8, 2022) (citation modified).[16]

23   **IV.  CONCLUSION**

24           For the foregoing reasons, the FAC should be dismissed without leave to amend.

25

26   _____

     [15] That Plaintiff did not exercise his contractual right to cancel his subscription after instituting this
27   suit does not mean that the Relevant Purchaser Terms are unconscionable. There is nothing
     surprising or oppressive about increasing service prices or modifying functionalities where, as
28   here, those rights are explained in the relevant contract.
     [16] Indeed, no private right of action exists. *Degrassi v. Cook*, 127 Cal. Rptr. 2d 508, 514 (2002).

1

2   Dated: January 21, 2026

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILLENKEN LLP


By:   /s/ Kenneth M. Trujillo-Jamison
Kenneth M. Trujillo-Jamison
Attorneys for Defendant X Corp.

DEF. X CORP.'S MOTION TO DISMISS OR TRANSFER